

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**ENTERED**
**08/29/2008**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **CRCGP LLC; dba C&R CONTRACTING** | § | **CASE NO: 04-31993** |
| **LTD; dba ECLECTIC CONSTRUCTION** | § | |
| Debtor(s) | § | |
| | § | **CHAPTER  7** |
| | § | |
| **RODNEY TOW,** *et al* | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 07-3117** |
| | § | |
| **MASSOOD DANESH PAJOOH; aka** | § | |
| **DANESH MASSOOD PAJOOH; aka** | § | |
| **DANESH MASSOOD; aka MASSOOD D.** | § | |
| **PAJ; aka PAJOOH MASSOOD DANESH;** | § | |
| **aka MASSOOD DANESH PAJOOH,** *et al* | § | |
| Defendant(s) | § | |

## <u>MEMORANDUM OPINION</u>

For the reasons set forth below, the Court awards judgment in favor of Plaintiffs in the amount of $429,240.28 plus 2.12% post-judgment interest accruing from the date of entry of judgment to the date of payment.  This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334.

### *Background and Stipulated Facts*

On February 3, 2004, CRCGP LLC ("Debtor") filed for chapter 7 bankruptcy protection. Rodney Tow ("Tow") was appointed trustee of the estate.  On July 11, 2005, Tow sued Behnad Corporation ("Behnad") and Massood Danesh Pajooh on behalf of the estate for, *inter alia*, usury.  The Court entered a Judgment in favor of Tow on February 15, 2007.  The Judgment awarded $184,556.52 in damages and $61,518.84 in attorney's fees with 5.10% post-judgment interest.  On June 7, 2007, Tow filed an application for receivership.  The Court appointed a

receiver on June 15, 2007.  The receiver has located no assets that have not been transferred to Defendants.  All of the usury judgment remains unpaid.

Tow now seeks to recover, under the Texas Uniform Fraudulent Transfer Act, seven allegedly fraudulent transfers that occurred between Behnad and Massood Danesh Pajooh ("Defendant"), County Investment LP and 3111 Chimney Rock Corporation (collectively "Defendants").[1]  The parties stipulate that the following transfers occurred:

| Property | Date of Deed | Date Recorded | Transferee | Stated[2] Value | Consideration |
|----------|--------------|---------------|------------|-----------------|---------------|
| Ashford Brook | 12/29/05 | 1/10/06 | County Investment LP | $155,000 | Assumption of Note |
| Rankin Road | 12/29/05 | 1/10/06 | County Investment LP | $1,800,000 | Assumption of Note + $393,517 credit on amounts owed Defendant |
| FM 529 | 12/29/05 | 1/10/06 | County Investment LP | $1,750,000 | Assumption of Note + $430,699 credit on amounts owed Defendant |
| Rancho Bauer | 12/29/05 | 3/1/06 | Defendant | $345,700 | $295,000 credit on amounts owed Defendant + assumption of liabilities |
| Tyneland Court | 5/5/05 | 7/19/06 | Defendant | $275,000 | $160,000 credit on amounts owed Defendant + assumption of liabilities |
| Leclerc | 6/6/05 | 7/19/06 | Defendant | $220,000 | $160,000 credit on amounts owed Defendant + assumption of liabilities |
| Chimney Rock | 7/25/06 | 8/4/06 | 3111 Chimney Rock Corp | $675,000 | $492,118 credit on amounts owed Defendant + assumption of liabilities |

The deeds of the Tyneland Court, Leclerc and Chimney Rock properties, when originally recorded, stated that consideration included "delivery of Grantee's promissory note" in amounts of $160,000, $160,000 and $492,118, respectively.   A "Corrected Special Warranty Deed," however, was recorded on these three properties on June 4, 2007, removing the reference to the promissory notes and stating that consideration included credits on a loan owed by Behnad to Defendant, in amounts of $160,000, $160,000 and $492,118, respectively (as set forth in the chart above).  Tow argues because the promissory notes would have been property of Behnad

---

[1] Behnad's debt was to the individual Defendant, Massood Danesh Pajooh.  As set forth in the text below, however, Massood Danesh Pajooh owns, in part, both County Investment L.P. and 3111 Chimney Rock Corporation. Accordingly, the transfers to these corporations were done in satisfaction of debts to the individual, Massood Danesh Pajooh.

[2] Stated Value is the value stated on Behnad, Inc. Financial Statement dated December 31, 2005.

available to satisfy Plaintiff's judgment, the deeds were changed solely to avoid paying Tow. Tow further asserts that in addition to these transfers of property, Behnad transferred $445,097.45 to Defendant.

The president of Behnad at the time of these transfers was Mansoor Pajooh ("Mansoor"). Mansoor is Defendant's brother. The parties do not dispute that Defendant is an insider of Behnad.

Defendant County Investment L.P. was formed on November 28, 2005. The general partner of County Investment L.P. is U.S. Capital Investment LLC. U.S. Capital Investment LLC was formed on May 5, 2005. Defendant is the organizer and one of the members of U.S. Capital Investment LLC. The other members are Mansoor and his sister. Defendant 3111 Chimney Rock Corporation was formed on July 6, 2006. The ownership and insider status of 3111 Chimney Rock is discussed in detail below.

### Uniform Fraudulent Transfers Act

Tow seeks relief under §§ 24.005 and 24.006 of the Texas Business and Commerce Code. Section 24.005 of the Texas Uniform Fraudulent Transfers Act (TUFTA) provides as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > > (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE ANN. § 24.005(a) (Vernon 2008). A four year statute of limitation applies to causes of action under § 24.005. *Id.* at § 24.010. TUFTA provides a nonexclusive list of factors to consider in evaluating intent. *Id.* at § 24.005(b). TUFTA also provides statutory defenses to § 24.005. If a transfer is made in good faith and for reasonably equivalent value, it is not avoidable under § 24.005(a)(1). *Id.* at § 24.009. Reasonably equivalent value is defined as "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* at § 24.004(d).

Section 24.006 provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

TEX. BUS. & COM. CODE ANN. § 24.006 (Vernon 2008). A four year statute of limitations applies to a cause of action under § 24.006(a). *Id.* at § 24.010. However, a one year statute of limitations applies to a cause of action brought under § 24.006(b). *Id.* Accordingly, and agreed to by the parties, only the Rancho Bauer, Tyneland, Leclerc and Chimney Rock property transfers would be avoidable under § 24.006(b). Further, the Code provides that a transfer under § 24.006(b) is not avoidable:

(1) to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien;

(2) if made in the ordinary course of business or financial affairs of the debtor and the insider; or

(3) if made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.

*Id.* at § 24.009.

In the parties' post-trial briefing, the parties dispute whose burden it is to show reasonably equivalent value. Defendants state, "the burden to prove that value of property conveyed was in excess of debt, in settlement of which it was made [is] upon creditor seeking to set conveyance aside." *Morgan Plan Co. v. Ferguson*, 45 S.W.2d 308, 310 (Tex. Civ. App.— Texarkana 1931, no writ). Tow, in response, argues that Defendants agreed in the joint pretrial statement that "Defendants bear the burden to prove that the alleged debt to Massood Pajooh was equivalent value for the transfers." Pl. Supp. Tr. Br. ¶ 1(b). The parties' joint pretrial statement contains the following stipulation under the heading "Agreed Applicable Propositions of Law:"

> Defendants bear the burden to prove that the alleged debt to Massood Pajooh was equivalent value for the transfers. When a creditor (1) contests the validity of an alleged preference by its debtor and (2) alleges and introduces evidence to show that the transfer was made to hinder and delay creditors, then the preferred creditor must overcome the showing of fraud by evidence of the existence in fact of the prior indebtedness. *Carwile v. Roberts*, 11 S.W.2d 549, 5050 (Tex. Civ. App. –Austin 1928, writ dism'd w.o.j.). The proof must also show the amount of the debt preferred and the value of the property conveyed, particularly where the preferred creditor is an insider. *Diltz v. Dodson*, 207 S.W. 356, 360 (Tex. Civ. App.—Fort Worth 1918, no writ).

Joint Pretrial Stmt, p. 14. Defendants respond and assert that in accordance with the Joint Pretrial Statement, Defendants established that the debt was equivalent value for the transfers and Tow failed to refute the values established. The Court finds the parties' stipulation in the pretrial statement ambiguous as to the extent of Defendants' burden in establishing reasonably equivalent value.

Accordingly, the Court will follow the well-accepted standard in Texas that "[t]he judgment creditor has the burden to prove the fraudulent transfer by a preponderance of the

5

evidence… [i]t is the creditor's burden to offer evidence addressing the elements of fraudulent transfer as to each transfer." *Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App.-Dallas 2007, no pet.) (citing *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 842-43 (Tex. App.-Dallas 2006, no pet.)). The elements to establish fraudulent transfers are set forth in the statute. It is Tow's burden to demonstrate each element.

However, certain statutes, such as § 24.005(a)(1), do not include the element of establishing reasonably equivalent value. Section 24.009 provides that establishing reasonably equivalent value is a defense to § 24.005(a)(1). Affirmative defenses are the Defendant's burden. *See Flores v. Robinson Roofing & Const. Co.,* 161 S.W.3d 750 (Tex. App.-Fort Worth 2005, no pet.) (citing UNIF. FRAUDULENT TRANSFER ACT § 8 cmt. 1, 7a II U.L.A. 352 (1999)) (evaluating summary judgment and § 24.009(a) and stating "good faith is an affirmative defense to a fraudulent transfer claim. 'The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged.'"). The Court will view the evidence accordingly.

### *Overview*

A determination of whether the transfers in this proceeding were fraudulent is complex. Tow is seeking to recover seven properties that were transferred out of Behnad over an approximate one year period. The usury suit against Behnad was pending when all the properties were transferred. During and after these transfers, Behnad did not seek to obtain any other properties. There is also evidence of other assets of Behnad's disappearing after the usury judgment was entered. Therefore, when examining the statutory requirements to prove fraud (specifically, intent), the Court examines not only the individual transfers, but also the fact that

the transfers together were of all or substantially all of Behnad's property.  To evaluate the statutory elements of each claim, the Court will make the following determinations:

*First: Did Behnad have a valid debt to Defendant?* Plaintiffs have argued that no true debt, or very little debt, was owed by Behnad to Defendant.  On this issue, the Court examines the structure of the business deals between Behnad and Defendants, the veracity of Behnad's amortization schedules of Defendant's loan and whether the parties intended, when creating the original deeds, to provide credits on amounts owed to Defendant rather than create promissory notes payable to Behnad.  The Court heard testimony from Behnad's accountant and from business associates of Defendant who loaned Behnad money guaranteed by Defendant.  The Court found the testimony of these parties to be highly credible.  The evidence and testimony supports a finding that a valid debt did exist.

*Second: Was Behnad insolvent and if so, when did it become insolvent, and did Defendant have knowledge of Behnad's activities sufficient to understand whether the company was solvent?*  To determine whether Behnad was insolvent at the time of the transfers, the Court examines Behnad's tax returns and the assets Behnad held during 2006 and 2007.  Specifically, the Court examines the existence of approximately $272,000 in rugs which were placed on consignment with Parvizian Signature Rugs from January 2, 2006 through March 23, 2007.  The Court finds, largely based the existence of these rugs, that Behnad was not insolvent at the time of the transfers nor was Behnad made insolvent as a result of these transfers.

*Third: Were the transfers for reasonably equivalent value?* Several different valuations of the properties have been presented to the Court.  These valuations include financial statements prepared by Defendant and Behnad, valuations of the properties as stated on tax returns, and valuations of the properties based on the transfer value reported on Behnad's amortization

schedule of Defendant's loan.  The Court finds that Behnad's and Defendant's financial statements are completely unreliable.

After considering other evidence in the form of testimony on the property regarding offers to purchase, appraisals, the original purchase price, the value of leases, the amount of money spent on construction and renovation, and comparables, the Court finds that the Rankin Road property is the only property that was transferred for less than reasonably equivalent value.

*Fourth:  How much debt encumbered the transferred properties?*  The Texas Business and Commerce Code provides that an asset fully encumbered by debt cannot be *per se* fraudulently transferred.  After comparing the amount of debt on the properties with the reasonably equivalent values of the properties, the Court determines that the Ashford Brook and Woodrows properties do not fall within the category of assets that can be found to have been fraudulently transferred pursuant to TUFTA.

*Fifth: Were the transfers done with intent to hinder, delay or defraud a creditor?*  In determining intent, the Court reviews the eleven badges of fraud set forth in the Business and Commerce Code § 24.005(b).  The Court also considers the following additional factors: (1) the credibility of Defendant and Mansoor and, specifically, their lies to federal banks and (2) the timing of the transfers and the timing of the usury lawsuit.  After considering these factors, the Court finds that the transfers of Rankin Road, FM 529, Rancho Bauer, Tyneland Court and Leclerc were done with fraudulent intent.

*Sixth: After the transfers, did the Debtor have unreasonably small assets?* This determination is necessary in evaluating whether a transfer was fraudulent under § 24.005(a)(2). The Court finds that the systematic transfer of assets during the pendency of the usury lawsuit

and the corresponding failure of Behnad to replenish its assets caused Behnad to have unreasonably small assets in the face of the impending usury judgment.

*Analysis*

### 1. Did Behnad Have a Valid Debt to Defendant?

**a. Defendant and Behnad's Business Dealings**

Defendants claim Behnad was in the real estate investment business where Defendants would loan money to Behnad on a "revolving promissory note" for Behnad to purchase properties. Behnad would then execute a Special Warranty Deed on that particular property to the Defendant that advanced the funds. Defendants claim this was done to protect them as lenders in the event Behnad could not sell the property or failed to repay the loan prior to their deadline to repay any investors, if investors were involved. Therefore, Defendants assert, the property transfers occurred in the ordinary course of business.

A line of credit promissory note was entered into between Behnad as Borrower and Defendant as Lender on February 11, 2004. The line of credit agreement provided that Defendant initially loaned Behnad $66,000 with Behnad able to borrow up to $2,500,000. The note was secured by "every real estate that was purchased or will be purchased to the extent it is personal property under applicable law, and all proceeds thereof any other mortgage property..." Def. Exh 1. Defendant also claims that many of the loans he made to Behnad were in the form of Defendant paying Behnad's liabilities to other creditors.

**b. The Accuracy of the Behnad's Amortization Schedules of Defendant's Loan**

At trial, the Court heard testimony on the validity of the debt from Gus Parvizian, Majid Tehrani, Mohammad Mesgarpouran, Jamie Musick, Mansoor Pajooh, and Defendant. Tow

asserts that Defendants stated in their request for admissions that the consideration for the transfers of property was payment of a debt to Defendant in the amount of $1,931,334.[3]

Gus Parvizian, Majid Tehrani, and Mohammad Mesgarpouran were business associates of Defendant and his brother. All three testified that (a) they had been asked by Defendant to loan money to Behnad; (b) Defendant guaranteed the loans; and (c) they trusted Defendant, did business on a handshake, and did not need paperwork to document their loans. All parties expected between 8% to 10% interest. The testimony was that the three associates had, in total, loaned approximately $438,377 to Behnad, guaranteed by Defendant.[4] The Court finds the testimony of these three witnesses credible. They further testified that they had not been repaid by Behnad. Mr. Parvizian and Mr. Tehrani testified they were repaid by stock in 3111 Chimney Rock while Mr. Mesgarpouran testified Defendant paid him $65,000 of amounts due.

Jamie Musick ("Musick") began serving as the accountant for Behnad in 2004. She also handles the books for Defendant personally and for some of Defendant's corporations. The Court finds her testimony highly credible. She testified that she primarily dealt with Mansoor when working for Behnad. Her contact with Defendant, when working for Behnad, was limited to the particular deals between Defendant and Behnad. In preparing general ledgers, Musick would rely on bank statements, copies of checks, deposit slips and handwritten ledgers given to her by Mansoor.

---

[3] As set forth in the chart above, this is comprised of credits on debt Behnad owed Defendant allocated to the following property transfers: $393,517 (Rankin Road) + $430,699 (FM 529) + $295,000 (Rancho Bauer) + $160,000 (Tyneland Court) + $160,000 (Leclerc) + $492,118 (Chimney Rock) = $1,931,334

[4] Gus Parvizian stated that Behnad owed him approximately $273,000; Mr. Tehrani had given Behnad two loans of $14,377 and $33,000; and Mr. Mesgarpouran testified to a loan of $118,000.

Amortization schedules for the alleged loan to Defendant were presented for the years 2004, 2005 and 2006. Musick testified she prepared her amortization schedules around March or May 2007 based on information given to her by Defendant and Mansoor.

Tow emphasized the non-contemporaneous nature of the amortization schedules. However, during the course of the trial, Musick reviewed Behnad's 2004, 2005 and 2006 amortization schedules of Defendant's loan. She was able to locate a corresponding bank statement for almost every entry. She also had allegedly contemporaneously kept handwritten ledgers of Mansoor to back-up the entries.

For 2004, there was only $700 for which she had no documentation. For 2006, there was one entry of $14,893.34 which was recorded twice and an entry of $25,000 which was for the sale of rugs and should not have been included in the amortization schedule of Defendant's loan. There was also one entry of $16,000 loaned to Behnad on August 5, 2005 for which Musick only had Mansoor's handwritten ledger and no corresponding bank deposit. However, Musick testified that the $16,000 was a check written by Defendant directly to a creditor of Behnad.

The Court finds that Musick's testimony rebuts allegations of fabrication of the amortization schedules. Additionally, the Court finds that the parties' activities during 2006 as to the Woodrows property rebut Plaintiff's allegations that the credits for the Woodrows, Tyneland and Leclerc properties stated on the amortization schedules should have actually been promissory notes Defendant was to pay Behnad.

### c. The "Corrected Special Warranty Deeds" on Woodrows, Tyneland and Leclerc

A promissory note was entered into on May 2, 2000, between Behnad and Defendant. Defendant loaned Behnad $425,000. The note was secured by the Woodrows property. The

note was extended to a five year term at 8% interest with a balance due on June 8, 2006, of $595,000.

On June 8, 2006 there is an entry on Musick's amortization schedule of $127,325.74. This entry relates to the sale of Woodrows. Musick testified Woodrows was sold to Defendant for $492,118. Musick therefore, offset the balance remaining on the mortgage (which was a balloon payment) of $619,443.74 with the $492,118 sales price.

The parties stipulate that on July 6, 2006, Defendant formed 3111 Chimney Rock Corporation ("Chimney Rock"). A deed dated July 25, 2006, shows that Behnad transferred Woodrows to Chimney Rock. Consideration for the exchange was stated as a $492,118 promissory note payable by Chimney Rock to Behnad.[5] However, like the Leclerc and the Tyneland deeds, this deed was amended on July 25, 2007 (signed on May 21, 2007) to state the consideration was a credit on indebtedness owed to Defendant by Behnad rather than an amount payable by Chimney Rock. Tow alleges this was done to avoid the notes being assets of Behnad available to satisfy the usury judgment.

The 2006 tax return of Chimney Rock Corporation discloses a tax free transfer of $492,118 in property from Defendant to Chimney Rock in exchange for 1000 shares of Chimney Rock stock valued at $492,118. As set forth above, Mr. Parvezian and Mr. Tehrani testified that Defendant repaid them for amounts they loaned Behnad by giving them stock in Chimney Rock. Chimney Rock stock certificates dated August 1, 2006, show that the ownership of the corporation is comprised of Defendant owning 210 shares, Mr. Hafezian owning 170 shares, Mr. Parvezian owning 520 shares and Mr. Tehrani owning 100 shares. Bylaws signed by the

---

[5] Like the $160,000 promissory notes stated on the original Leclerc and Tyneland deeds, these notes would have been available to Behnad to satisfy its usury judgment. Furthermore, these notes, if they exited, would have been assets of Behnad in 2005 and should have been reported on the 2005 tax return.

shareholders on August 1, 2006, reflect the same four men as the only shareholders.  Musick's amortization schedule shows assumption of debt by Defendant on January 1, 2006, of the Tehrani Balance of $50,377.00 and the Parvizian Balance of $273,000.00.  Defendant testified that he cancelled approximately $500,000 in debt due from Behnad when he received the 1000 shares in Chimney Rock Corporation.

The Court finds that Chimney Rock is owned in proportion of the shares as set forth above.  Nevertheless, the Court is concerned about the Defendant's apparent lack of truthfulness in communications with the IRS.  In 2007, Chimney Rock filed an IRS Form 2553 (Election by a Small Business Corporation).  The form is dated March 15, 2007.  On that form, Defendant is listed as president of the corporation with 100% ownership of the shares of the corporation.  Defendant testified he was told to sign this paper by his accountant and he did so without reviewing it.

Based on the reconciliation in Ms. Musick's ledger of a credit to Behnad of Woodrow's value against the mortgage payable on Woodrows, the Court finds that the intent of the parties when creating the original deeds was to provide credits on amounts owed to Defendant rather than create promissory notes payable to Behnad.  Musick's 2006 amortization schedule and 2006 general ledger also reflect two payments to Defendant of $160,000, which accounts for the Leclerc and Tyneland notes.   Although the truthfulness of the non-contemporaneous amortization schedule was put into question by Tow, the Court finds that Defendant rebutted such accusations.

Accordingly, based on the testimony of Ms. Musick and the three business associates of Defendant, the Court finds a valid debt did exist and that part of consideration for the transfer of the properties was credits on the debt owed Behnad.

#### d. The Amount of the Debt

Tow asked Defendants to produce evidence of all amounts, other than those relating to the properties, Defendant received from Behnad.  Defendant produced exhibit 68 which is a collection of mostly checks.  These amounts total $445,097.56.  All of these payments, except for $43,871, appear on Musick's amortization schedule.

Tow also introduced into evidence exhibit 65.  Exhibit 65 was produced by Defendants to prove the amount of debt due Defendant from Behnad.  This exhibit is a collage of checks, receipts, and deposit slips written from various entities to various other parties.  Some are written to Defendant, most are not.  Only some appear on the amortization schedules.  According to Tow, the checks in exhibit 65 total $1,791,301.79.  The Court finds exhibit 65 completely unreliable.

As stated above, however, Ms Musick was an extremely credible witness.  She testified to the veracity of her amortization schedules and testified that she had evidence to back up the majority of the entries relating to the loans from Defendant to Behnad.  Exhibit 68 illustrating the payments made by Behnad to Defendant is mostly reconcilable with Musick's amortization schedule.

Accordingly, other than the entries for which Musick could not reconcile, the Court finds that the amortization schedule is a true report of the amount of debt Defendant loaned Behnad and the amount Defendant was repaid.  The amounts loaned to Behnad, however, must be reduced by $700 which could not be accounted for, the $14,893.34 double entry, and the $25,000 attributable to the sale of rugs.[6]  The Court will also reduce the total amount of debt by $3,664.67, which is the amount of interest attributable to these entries.

---

[6] Tow also argued there were other mistakes in the Amortization schedule as to the timing of the booking of the entries.  For example, Tow argued that the $160,000 entries related to Leclerc and Tyneland, which were dated July

### 2. Was Debtor Insolvent and Did Defendant have Knowledge of Debtor's Insolvency?

The insolvency of the debtor is a statutorily required element of a claim under § 24.006. The parties stipulate that an insolvent debtor is defined in the Texas Business and Commerce Code by § 24.003(a).  Section 24.003(a) provides that a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  TEX. BUS. & COM. CODE § 24.003(a).[7]  "Debt" is defined as "liability on a claim." *Id.* at § 24.002(5).  "Claim" is "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  *Id.* at § 24.005(3).  Accordingly, in determining insolvency, the Court must consider the usury judgment as a debt.

For purposes of TUFTA, the transfers are considered to have been made at the time the deeds were recorded.  Section 24.007 of the Texas Business and Commerce Code provides that a transfer occurs as follows:

> with respect to an asset that is real property other than a fixture, but including the interest of a seller or purchaser under a contract for the sale of the asset, when the transfer is so far perfected that a good faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee…

TEX. BUS. & COM. CODE § 24.007(1)(A).  Therefore, although Texas law provides that title transfers upon execution and delivery of the deed, *Adams v. First Nat'l. Bank of Bells/Savoy*, 154 S.W.3d 859, 569 (Tex. App.-Dallas 2005, no. pet. h.) (citing TEX. PROP. CODE ANN. § 5.021

---

6 2006, should have been booked in May and June 2005 which is the dates on the original deed.  As such, Tow argues the amount of interest charged in the amortization schedule should be adjusted.  The Court rejects this argument.  As set forth below in the text, for purposes of TUFTA, a transfer occurs when the interest is perfected.  *Adams v. First Nat'l. Bank of Bells/Savoy*, 154 S.W.3d 859, 569 (Tex. App.-Dallas 2005, no. pet. h.).  The transfers of Leclerc and Tyneland were perfected in July 2007.  Accordingly, the interest amount should not be adjusted.

7 Section 24.003(b) also provides that a debtor is presumed to be insolvent if the debtor "is generally not paying the debtor's debts as they become due."  TEX. BUS. & COM. CODE § 23.003(b).

(Vernon 2003)), TUFTA requires the transfer to be perfected.  This occurs when the deed is recorded.  All of the deeds in this proceeding were recorded in 2006.

For a transfer to be fraudulent under to § 24.006(a), the debtor must be insolvent at the time of the transfer or have become insolvent as a result of the transfer.  TEX. BUS. & COM. CODE § 24.006(a).  Pursuant to § 24.006(b), a transfer is fraudulent if the debtor was insolvent at the time of the transfer.  *Id.* at § 24.006(b).  Accordingly, the relevant time frame for considering insolvency is during 2006 and thereafter.

The Court relies primarily on three exhibits as to Behnad's condition of solvency: (1) Behnad's 2006 tax return; (2) Tow's exhibit 30 evidencing Behnad's ownership of certain rugs; and (3) Behnad's Answers to Tow's set of interrogatories in the usury lawsuit.

On Behnad's tax return for 2006, Behnad reports assets of $360,049 and liabilities of only $11,701.  Approximately, $272,000 of the assets consisted of rugs.  Mansoor testified that currently he had no knowledge of the location of the rugs.

Tow introduced several documents from Parvizian Signature Rugs.  The first document is an "*Incoming* Rugs Transaction Sheet."  It reflects that Behnad placed eleven rugs on consignment with Parvizian Signature Rugs on January 2, 2006.  The rugs were valued at $391,000.  Two "*Outgoing* Rugs Transaction Sheets" were admitted into evidence.  The first sheet reflects that three rugs, valued at $103,000 were returned to Behnad on September 15, 2006.  The second sheet reflects that five rugs, valued at $263,000, were returned to Behnad on March 23, 2007.  Mr. Parvizian testified that these rugs were picked up by a delivery person.  The three non-returned rugs were valued at $25,000 total.  Behnad received a check for $25,000 for these rugs on February 17, 2006.

Based on the documents showing Behnad's ownership, the Court finds Behnad did have the rugs as assets during 2006 and, at least through March 2007. The Court's conclusion is supported by Behnad's post-usury judgment answers to interrogatories:

> Q.4:   Explain whether you were "insolvent" on February 26, 2006 … Your answer should include (1) a list of property with a fair valuation of property and (2) a list of debts and amounts of each debt.

> A.4:   Objection… [Behnad] possessed the assets and had the liabilities reflected in its 2006 Federal Income Tax Return… Behnad, Inc. also possessed several rugs that were placed on consignment with different rug shops in the Houston area.

It is Tow's burden to show that Behnad was insolvent at the time of the transfers or was made insolvent as a result of the transfers. For purposes of TUFTA, the transfers occurred in January, March, July and August of 2006. The 2006 tax return reflects Behnad had $360,049 in assets and $11,701[8] in liabilities. The usury judgment entered on February 15, 2007, was for $184,556.52 in damages and $61,518.84 in attorney's fees with 5.10% post-judgment interest. Accordingly, as of December 31, 2006, Behnad's debts did not exceed its assets.[9] The Court finds Tow has not met his burden to show that Behnad was insolvent at the time of the transfers or as a result of the transfers. Tow cannot prevail under § 24.006. The question of whether Defendant had knowledge of Behnad's insolvency is now moot.

### 3. Were the Exchanges for Reasonably Equivalent Value?

### a. Property Values Reflected on Behnad's and Defendants' Financial Statements

Because reasonably equivalent value is integral to the claims under § 24.005, the Court will examine whether the exchanges were for reasonably equivalent value.

---

[8] Behnad booked liabilities on its 2006 tax return as follows: $54,449 in mortgages notes, bonds payable in less than one year, $8,650 in other current liabilities, and a debit of $51,938 for federal income tax overpaid.

[9] Furthermore, the Court finds that there is no evidence that during 2006, Behnad was "generally not paying [its] debts as they become due." TEX. BUS. & COM. CODE § 23.003(b).

As set forth above, the parties have disputed who bears the burden of establishing reasonably equivalent value (or lack thereof).   Section § 24.009 provides that whether a transfer is made in good faith and for reasonable equivalent value is a defense to § 24.005(a)(1). Accordingly, as to § 24.005(a)(1), it is Defendant's burden to show the exchanges were for reasonably equivalent value.   However, § 24.005(a)(2) contains the element of proving that reasonably equivalent value was not exchanged.   Tow, therefore, bears the burden under § 24.005(a)(2).  Reasonably equivalent value is "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction."  *Id.* at § 24.004(d).

Tow introduced into evidence 2004 and 2005 Financial Statements of Behnad and a 2006 Statement of Defendant.   Defendant introduced a 2006 Financial Statement of Behnad.   The Statements Tow presented were prepared and given to banks for the purpose of obtaining loans. The Statement Defendant presented was given to a mortgage company to obtain a loan.   The chart below sets forth the alleged market value of these properties as reflected on the financial statements:

| End of Year Market Value of Properties as stated Behnad and Defendant Financial Statements | | | | |
|---|---|---|---|---|
| **Property** | **Dec. 31, 2004 Behnad** | **Dec. 31, 2005 Behnad** | **Jan. 1, 2006 Behnad** | **Dec. 31, 2006 Defendant** |
| Rancho Bauer | 295,700 | 345,700 | 255,000 | - |
| Tyneland | 175,000 | 275,000 | 175,000 | 250,000 |
| Leclerc | 175,000 | 220,000 | 175,000 | - |
| Woodrows | 435,000 | 675,000 | 455,000 | 875,000 |
| Rankin Road | - | 1,800,000 | 755,000 | 2,700,000 |
| FM 529 | - | 1,750,000 | 1,100,000 | 2,200,000 |
| Ashford Brook | - | 155,000 | 145,000 | - |
| **Total Value:** | **1,080,700.00** | **5,220,700.00** | **3,060,000** | **6,025,000** |

The December 31, 2004[10] statement includes monthly income of $5,100 on a 15 year lease for the Woodrows location. The December 31, 2005 Financial Statement of Behnad reflects monthly income of $5,400 on a 15 year lease for Woodrows; monthly income of $14,021.08 on FM 529 on either 10 or 20 year leases; monthly income of $2,000 on the Leclerc Property on a 1 year lease; and monthly income of $850 on the Ashford Brook property on a 3 year lease.  The 2006 Statement for Behnad includes monthly income of $5,700 on Woodrows with a 15 year lease; $11,621.08 on FM 529 with a 10 year lease; and $800 on Ashford Park with no lease period stated.   Defendant's 2006 Financial Statement shows that 3111 Chimney Rock Corporation owns the Woodrows property and that monthly rent received is $5,400.00 for Woodrows; $14,395 for FM 529; and $18,827.15 for Rankin Road.[11]

Notably, the 2006 Behnad Financial Statement was prepared one day after Behnad's 2005 Financial Statement.  Mansoor testified that he told his manager to fill out the 2005 Statement, but that the information contained therein is erroneous.  Mansoor further testified that when the 2006 Statement was completed, he contacted Mr. Mohammad Alipourlashkarian, the alleged president and 100% shareholder of Behnad, who provided the information for the 2006 Financial Statement.

A vice-president of Vista Bank Texas, who previously was employed by Republic bank, testified that the Behnad 2005 Financial Statement was delivered to him in connection with a

---

[10] Also presented into evidence was a February 28, 2005 Financial Statement.  It reflects the same values for the properties and the same monthly income for Woodrows as the December 31, 2004 Financial Statement.

[11] In Schedule A of Defendant's 2006 Financial Statement, Defendant was required to list institutions where he maintains a deposit account or has obtained loans.  Schedule A reflects a loan due of $826,000 in the name of County Investment.  Schedule C lists "Real Estate Owned," by Defendant.  Defendant stated he owned Rankin Road and FM 529, but that both were titled in the name of County Investments.  The amount of debt was listed at $826,000 on FM 529 and $300,000 on Rankin Road.  Furthermore, the Statement lists no contingent liabilities of Defendant, including liabilities as a guarantor.  The Court, therefore, finds that Defendant controlled Country Investment, L.P. and was liable on the debt.

loan application.  The bank relied on the document to be true and correct.  The document shows no funds owed to Defendant.  The vice-president further testified that FM 529 was empty when it was originally financed, but at the end of 2005 it was at least 70% - 80% leased.  The vice-president further testified that the 2006 Financial Statement was delivered to him in early 2007.

Behnad's 2005 tax return contains significantly different valuations for the properties then those set forth in the Financial Statements.  Pursuant to the 2005 tax return, the majority of Behnad's assets consisted of the real properties at question in this proceeding.  In 2005, Behnad reported end of the year assets at $2,766,886.  Of this amount $103,458 was allocated to cash, $103,142 to "other current assets," and $4,480 to intangible assets.  The remaining $2,555,706 was allocated to building and land.  At least $2,426,125 was comprised of the following properties: Woodrows, Rancho Bauer, Tyneland, Leclerc, Rankin Road and FM 529.[12]  The 2005 tax return balance sheet reflects Behnad having $277,138 in capital and $2,489,748 in liabilities.  With the exception of Woodrows, which was purchased in 2001, all of the properties were purchased in 2004 or 2005.

There are significant discrepancies between the Financial Statements, Musick's records and the tax returns.[13]  Musick testified that as an accountant, the Financial Statements were

---

[12] According to the 2005 tax return, during 2005, Behnad disposed of three properties: (i) 7803 Eastern Bluebird; (ii) 1022 Hodgkins St; and (iii) 323 Westwick.  The 2005 Depreciation and Amortization Report shows that throughout 2005, Behnad was depreciating land and a building on  the following nine properties: (i) Woodrows; (ii) Eastern Bluebird; (iii) Hodgkins; (iv) Westwick; (v) Rancho Bauer; (vi) Tyneland; (vii) Leclerc; (viii) Rankin Road; and (ix) FM 529.  Accordingly, it appears that these six properties were the only building and land remaining at the end of 2005.  Based on the depreciation schedule, these properties, except for Woodrows were all purchased in 2004 or 2005.  Woodrows was purchased in 2001.  The total basis costs for these six properties is $2,270,282.00.  According to Form 4562, the total basis costs of improvements on these properties for 2005 was approximately $155,843.  So, roughly, these properties must have accounted for, at least $2,426,125 in the cost of building and land as reported in the Schedule L Balance sheet accompanying the 2005 tax return.

[13] These discrepancies include: (a) the Financial Statement lists ownership of two additional pieces of property than those stated in Musick's records; (b) the Financial Statement lists $204,041.28 in cash as opposed to the balance sheet on the tax return which lists $103,458 in cash; (c) the Financial Statement includes an accounts receivable entitled "from cousin" of $134,999.98 which is not included in Musick's statements; (d) the Financial Statement lists total liabilities of $1,132,000 while the tax return includes "mortgages, notes, bonds payable in 1 year or more"

irreconcilable with her records and with Behnad's tax returns.  Musick stated that if the Financial Statements were correct, the IRS may take the position the tax return was incorrect.  The Court finds the Financial Statements to be a completely unreliable source for the value of the properties.

### b. Valuations of Specific Properties

Musick testified that at the time the properties were transferred she believed she was valuing the properties at their basis.  She specifically remembered speaking with Mansoor and Defendant about making certain that all the properties were at fair market value.  However, no additional market valuation was performed.  Musick stated because of the recent purchases of all the properties (except for Woodrows) she believed it was reasonable to assume that the basis equaled the fair market value of the properties.

The following chart summarizes the amount Defendant and Behnad valued the properties when the properties were transferred:

| Value of Property Received for Transfers | | | |
|---|---|---|---|
| Property | Amount Credited | Debt Assumed | Total Value |
| Rancho Bauer | 295,000.00 | - | 295,000.00 |
| Tyneland | 160,000.00 | - | 160,000.00 |
| Leclerc | 160,000.00 | - | 160,000.00 |
| Woodrows | 492,118.00 | - | 492,118.00 |
| Rankin Rd | 393,517.00 | 300,000.00 | 693,517.00 |
| FM 529 | 430,699.00 | 714,000.00 | 1,144,699.00 |
| Ashford Brook | - | 118,575.00 | 118,575.00 |
| **Total Value:** | 1,931,334.00 | 1,132,575.00 | 3,063,909.00 |

Although the pre-trial statement stated that assumption of other liabilities was consideration for the transfers, no testimony was offered to support such a stipulation.

of $2,532,496; and (e) the Financial Statement shows gross monthly income of $38,996.95 which is inconsistent with gross monthly income as stated on the tax return

### i. Ashford Brook

Musick testified that she had no knowledge of the Ashford Brook property.  Defendant testified that the property never appeared on Behnad's books because Defendant took it over so quickly.  A note between Behnad and Republic National Bank dated May 16, 2005, showed a loan of $118,575 secured by the Ashford Brook property.  Documentation was provided of the total payoff amount on the loan.  The total payoff amount was $121,719.  Defendant testified that the Ashford Brook property was transferred to him and he assumed the entirety of the debt.  To show that the debt amount was the fair market value of the property, Defendant offered an MLS listing for similar properties which were priced at $119,900 and $125,000.  Tow did not rebut this testimony.  Accordingly, the Court finds that the Ashford Brook property was transferred for a reasonably equivalent value.

### ii. Rankin Road

Defendants assert that Behnad originally purchased the Rankin Road property for $400,000 by putting $100,000 down and receiving a loan for $300,000.  Musick's amortization schedule reflects that on January 1, 2006, Behnad debited the loan to Defendant $393,517 attributable to the transfer of the Rankin Road property.  County Investments asserts it assumed the $300,000 note.  The total transfer value, therefore, was $693,517.

A letter of default from the holder of the Rankin Road note was presented into evidence.  The letter showed that as of March 22, 2007, the principal balance on the note was due and Behnad was in default on the loan in the amount of $300,000.  On May 10, 2007, the note was assigned to Business Management LLC.  Defendant testified that he was responsible for having the note assigned and that County Investment is the party now liable on the note.  This is consistent with Defendant's 2006 Financial Statement.  The evidence also showed that payments

were made by County Investment d/b/a Texas Property Management to the note holder of Rankin Road, monthly, from March 2006 through December 2006.[14]  The Court, therefore, finds that County Investments assumed the $300,000 note.

In 2006, the Harris County Appraisal District ("HCAD") valued the property at $187,500.  Defendant testified that when County Investments obtained the property, a retail center was in the process of being built.  The HCAD valuation was so low in 2006 because of the incomplete construction.

At trial, Tehrani stated that he attempted to purchase the Rankin Road property.  After depositing $300,000 with the title company, Tehrani was told that there was a *lis pendens* on the property and he could not purchase it.  Tehrani testified that he offered $2.9 million for the property.  Mansoor stated he did not know how much the property was worth on December 31, 2005, but that the property had a $300,000 note and he had spent approximately $69,000 on the property.

On Behnad's 2005 Financial Statement, the Rankin Road property is valued at $1.8 million and shows that it generates $16,725.15 per month on a 20 year lease.  Mansoor testified that $1.8 million was the value of the property if it was completed, but as of the date of the Financial Statement, the property was not completed.

Defendant valued the property at $2.7 million on his 2006 Financial Statement.  He asserted this was a correct valuation.  The Financial Statement further represents that the property "cost plus improvements" was $1,550,000 and that the property was rented, beginning August 2006 for $18,827.15.  He maintained the property was rented, but he had yet to collect the funds.  Defendant stated that Rankin was not completed until May 2007, he spent

---

[14] More specifically, there was no monthly payment made in April 2006 and two monthly payments made in August 2006.

approximately $600,000 to $700,000 repairing the property and the value Tehrani offered included consideration of rent at $18,827.15 per month on a twenty year lease.

The HCAD appraisal valuation for this property shows that the property was not complete in 2006 at the time of the transfer to Defendant. However, the 2005 Financial Statements of Behnad showed that the property was generating $16,725.15 in monthly rent. Massood testified that the tenant had signed the lease, but the property was incomplete. The 2006 Financial Statement of Defendant claimed that the property was generating $18,827.15 of monthly rent beginning in August 2006. The Court, therefore, finds that value the leases add to the property should have been factored into the amount of consideration Behnad received for the transfer.

The value Defendant placed on the property at the time of transfer on January 1, 2006, was $693,517. The Court has found that the valuations in the Financial Statements are unreliable. The only other valuation for the property is Mr. Tehrani's testimony that he offered $2.9 million for the property. Mr. Tehrani was a credible witness; however, the Court does not know the precise date of when Mr. Tehrani made his offer.

Defendant testified that he spent approximately $600,000 to $700,000 finishing the property after he received the transfer. The HCAD appraisal illustrates that the property was, indeed, incomplete on January 1, 2006. Accordingly, the Court will credit Defendant with $600,000 in considering the reasonably equivalent value of the property.

The Court concludes, however, that based on Mr. Tehrani's testimony of offering $2.9 million for the property and the expected rental income on a twenty year lease, Defendant's time-of-transfer valuation of $693,517 plus $600,000 in improvements, is not a reasonably equivalent value for the Rankin Road property.

### iii. FM 529

FM 529 is a retail center that was under construction when Defendant recorded the deed. Behnad stated that the total value of FM 529 was $1,144,699 which consisted of assumption of a $714,000 note on the property and a debt of $430,699 on the loan to Behnad.  The original settlement statement for the property dated April 13, 2005, shows Behnad purchased the property for $1,050,000.  An extension of the note on the property was entered into on June 13, 2006, between County Investment and Republic National Bank.  The Court finds, therefore, that County Investment, assumed the loan of $714,000 when the property was transferred.  The HCAD valuation for 2006 values the property at $882,660.  Defendant testified that the property was incomplete when he obtained it.  Defendant testified he currently had a contract on FM 529 for $1.6 million.

Musick testified at the time of the transfer of the FM 529 she valued it at $1,144,699 with debt of $714,000.  She believed that FM 529 had recently been purchased and was in the process of being constructed.  She did not believe that FM 529 had been finished and rented.  Indeed, she testified that at the time of the transfer, she had seen additional construction costs on the next year's returns.  If, to her knowledge, the property was finished and leased she would have told Mansoor and Defendant that the property needed to be reappraised.

Defendant's 2006 Financial Statement shows that the total amount of monthly rent attributable to FM 529 is $14,395.   This income is generated from six businesses in six different suites.  The start dates for the rents are listed as November 2005, October 2005, October 2005, January 2006, April 2006 and July 2006.  Defendant asserted that this document was not accurate.  Mansoor, however, testified that Behnad's Financial Statement for 2005 was correct. The vice-president of Republic Bank who loaned funds to Behnad after the delivery of Behnad's

2005 Financial Statement testified that he believed FM 529 was empty when it was originally financed, but at the end of 2005 it was at least 70% - 80% leased.  Behnad's Financial Statement showed that rent was collected on four of the suites in FM 529 during 2005 for $14,021.[15] Defendant, however, testified that all of these leases were in place at the time that he took over the property, but that he had yet to collect any rent.   Defendant stated he spent almost $350,000 improving the property.

The Court finds Defendant's testimony as to the occupancy of FM 529 lacks credibility. Furthermore, even if FM 529 was not occupied, Defendant had secured leases and the value of the property when transferred to Defendant should reflect as much.

Defendant valued the property at $1,144,699 when the transfer occurred and testified that since that time he has spent almost $350,000 on the property and has increased the occupancy to 100%.  The only evidence the Court has of another valuation of the property is the testimony of Defendant that he has a contract on FM 529 for $1.6 million.  The Court has no other valuations. Therefore, considering the improvements to the property, the Court finds that Defendant has demonstrated that the transfer value of FM 529 was within the "range of values for which the transferor would have sold the assets in an arm's length transaction."  TEX. BUS. & COM. CODE ANN. § 24.004(d).

*iv. Rancho Bauer*

The Rancho Bauer property was owned outright Behnad.  A credit of $295,000 was applied to the amount Defendant was owed when the property was transferred.  The settlement statement offered by Defendant shows that Behnad paid $225,000 for Rancho Bauer.  Massood

---

[15] Specifically, Behnad's 2005 Financial Statement showed the following rents collected on FM 529: Suite A $4,902; Suite B $2,956; Suite C $3,763; Suite E $2,400.  Defendant's 2006 Financial Statement showed rents as: Suite A $4,902; Suite B $2,730; Suite C $3,763 and Suite E $2,000.

testified that Rancho Bauer had a badly damaged pool.  Defendant testified that after he received the property he spent about $35,000 on repairing the pool and upgrading the kitchen.  An MLS listing was presented showing the house next door to Rancho Bauer was listed at $266,900. Defendant testified that he sold the house to an investor for $375,000 on the basis that the property would produce $3500 per month for five years.  The property was sold by Defendant almost one year after the transfer.  In total, Defendant testified he put approximately $50,000 into the property.  After considering the evidence presented as to Rancho Bauer, the Court finds that Tow did not establish that the property was transferred for less that reasonably equivalent value.

### v. Tyneland

Tyneland was purchased by Behnad on October 26, 2004.  The settlement statement shows it was purchased for $158,000.  Behnad's debt was debited $160,000 when the transfer of Tyneland to Defendant occurred in July 2006.  Defendant presented a MLS listing for Tyneland listing the property at $209,000 as of June 17, 2006.  Defendant stated the property did not sell for this amount.  Defendant also presented two other MLS listings for properties in the same subdivision that were the same size and listed at $147,200 and $159,500.

Defendant testified that he assumed the note on this property.  On his personal financial statement, Defendant lists this property as valued at $250,000.  He states this valuation is based on the house being occupied with a 5 year lease.  He testified, however, that if he sold the property with it empty he would receive much less.  He also testified that he put about $15,000 in furniture in the house.  No other valuation of the property was presented by Tow.  The Court finds that $160,000 is a reasonable valuation.  Tow did not establish that the house transferred for less than reasonably equivalent value.

### vi. Leclerc

Leclerc was purchased by Behnad on October 27, 2004. The settlement statement on the Leclerc property shows that Behnad originally paid $110,000. Defendant testified that Behnad put $25,000 to $30,000 into the property before the transfer. Defendant stated that after the transfer he put new siding on the back of the property, installed new insulation and treated the home for termites. There was also some foundation work done. Defendant believed that $160,000 was a fair market price at the time of transfer. Defendant stated that he sold Leclerc for $240,000. The Court finds that $160,000 was a reasonably equivalent value for the property.

### vii. Woodrows

The Woodrows property was structured as a different type of deal than the other property transfers. As set forth above, the Woodrows transaction originated with a $425,000 note entered into between Defendant and Behnad. The note was secured by the Woodrows property. The note was extended to a five year term at 8% interest with a balance due on June 8, 2006, of $595,000. On June 8, 2006, there is a credit entry on Musick's amortization schedule of $127,325.74. Musick testified Woodrows was sold to Defendant for $492,118. Musick therefore, offset the balance remaining on the mortgage (which was a balloon payment) of $619,443.74 with the $492,118 sales price. HCAD appraised the property in 2006 at $292,118.[16] Defendant testified he had a contract on the property for $550,000 less a $30,000 credit for a damaged driveway. Tehrani testified that he offered $450,000.

Two different experts testified as to the value of Woodrows. Tow's appraiser testified that he would value the property at $590,000 as of the date of the transfer. To determine the value he compared other vacant land sales in the area. Defendant's expert testified that the value

---

[16] The witness testified that the property appraised at $291,118. The HCAD report shows $292,118.

of the land as of the time of the transfer was $480,000.  The Court found neither expert to have employed a particularly accurate method of appraisal.

The Court finds that Tow has not established that this transfer was not for a reasonably equivalent value.  The record reflects that Tehrani offered $450,000 for the property.  The appraisers valued the property between $480,000 and $590,000.  Defendant testified to an offer on the property of approximately $520,000.  The Court finds that $492,118 is not outside of the "range of values" for a sale of this property in an arms length transaction.   Accordingly, the Court finds the exchange of Woodrows was for reasonably equivalent value.

### 4. The Amount of Debt Encumbering the Transferred Properties.

The Court must now examine the amount of debt on the properties at the time they were transferred in relation to their values.  Quoting the Texas Business and Commerce Code, Defendants argue that Behnad's assets should not include property "to the extent it is encumbered by a valid lien."   TEX. BUS. & COM. CODE § 24.002(a)(2).  Because several of the properties are encumbered by liens, Defendants argue that "[e]ven if Defendants received Behnad's assets, the assets would have been encumbered by the liens; therefore, Behnad had no 'assets' to fraudulently transfer."  Pre-trial stmt p.4.

The Court finds that Defendants may, in part, be misconstruing the application and definition of asset.  The amount of an asset encumbered by a lien may not be recoverable to the creditor (because of the first priority lien) and may not be included in the calculation of assets of the debtor (at least, without accounting for the offsetting liability), but the fact that an asset is encumbered, in part, by a lien does not make the entire asset non-recoverable as a fraudulent transfer.

However, as to assets which are fully encumbered by liens, the Court finds such asset cannot be fraudulently transferred. A "transfer" is defined as "every mode… of disposing of… and asset." Tex. Bus. & Com. Code § 24.002(12). As Defendants assert, an "asset" does not include "property *to the extent* it is encumbered by a valid lien." *Id.* at § 24.002(2) (emphasis added). As set forth above, Defendant had a lien on Woodrows which exceeded the value of the property. The Ashford Brook property was also completely encumbered by debt. These properties, therefore, fall outside of the definition of assets that can be fraudulently transferred.

Rankin Road and FM 529 were also encumbered by debts of $300,000 and $714,000, respectively. However, the fair market value of these properties substantially exceeded the amount of debt. The remaining properties, Rancho Bauer, Tyneland Court and Leclerc were owned free and clear of any liens. The Court finds these five properties, therefore, are not excluded from assets that can be fraudulently transferred.

### *5. Were the Transfers Done with Intent to Hinder, Delay or Defraud any Creditor?*

Section 24.005(a)(1) provides that a transfer is fraudulent if it was done "with actual intent to hinder, delay or defraud any creditor of the debtor[.]" TEX. BUS. & COM. § 24.005(a)(1). TUFTA provides a non-exclusive list of factors to consider when evaluating actual intent under § 24.005(a)(1). These factors are commonly referred to as "badges of fraud." *Mladenka v. Mladenka*, 130 S.W.3d 397, 405. (Tex. App.-Houston [14 Dist.] 2004, no pet. h.). "When several of these 'badges of fraud' are found, they can be a proper basis for an inference of fraud." *Id.* (citing *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988). The factors include:

1. the transfer or obligation was to an insider;

2. the debtor retained possession or control of the property transferred after the transfer;

3.  the transfer or obligation was concealed;

4.  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5.  the transfer was of substantially all the debtor's assets;

6.  the debtor absconded;

7.  the debtor removed or concealed assets;

8.  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9.  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE § 24.005(b).

### a. Factors Weighing in Favor of a Finding of Fraudulent Transfer (Applies to All Properties)

The Court finds that factors one, four, five, six, seven, and nine are in favor of Tow as to all of the property transfers.

*Factor one: the transfer or obligation was to an insider.*  There is no question that Defendant Massood Pajooh is an insider.  The parties have stipulated as much.  Defendant Massood Pajooh also is at least, in part, owner of 3111 Chimney Rock Corporation and County Investment.  He has been the party in control of both corporations.  Furthermore, the general partner of County Investments is U.S. Capital Investments, of which Mansoor, the president of Behnad, is a member.  Accordingly, the Court finds that 3111 Chimney Rock and County Investments are insiders, as well.

31

*Factor four: Before the transfer was made, the debtor had been sued.*  The usury suit was filed on July 11, 2005.  The Judgment awarding $184,556.52 in damages and $61,518.84 in attorney's fees was entered February 15, 2007.  The transfers occurred in 2006.  The applicability of this factor is obvious.

*Factors five and seven: The transfer was of substantially all the debtor's assets. The debtor removed or concealed assets.*  The usury lawsuit was filed on July 11, 2005, against Behnad and Defendant Massood Pajooh.  Judgment was awarded against Behnad only.  At the trial of this adversary proceeding, Defendant testified that he was continuously aware of the usury lawsuit and its progress.  The transfers in this proceeding began after the usury suit was filed.  Over the next year, Behnad transferred all seven of its real properties to Defendant.  The remaining assets after the transfers of the properties were rugs.

Trial was held in the usury lawsuit on November 27, 2006.  After post-trial briefing, the Court entered a judgment in February 2007.  At that time, the rugs were the only assets of Behnad.  The rugs were returned to Behnad on March 23, 2007.  Since that time, however, the rugs have disappeared.  Mansoor testified that he had no knowledge of where the rugs are now. Behnad, therefore, transferred substantially all of its assets out of the corporation during the pendency of the usury suit and has now concealed the whereabouts of the rugs.  Accordingly, the Court finds factors five and seven weigh in favor of Tow.

*Factor six: The Debtor absconded.*  Mr. Mohammad Alipourlashkarian[17] holds himself out to be a director of Behnad.  Mansoor Pajooh stated that Mr. Alipourlashkarian is the 100% shareholder of Behnad.  The parties have stipulated to the following facts as to the activities of Behnad since the usury judgment:

---

[17] In interrogatories, Mr Alipourlashkarian's name has been spelled Alipoulashkarian.  Other Court documents reflect the spelling of "Alipourlashkarian."  The Court will refer to him as Mr. Alipourlashkarian.

> On June 12, 2007, after the usury judgment, Behnad filed Articles of Amendment claiming that Massood Pajooh was never president.  The Articles of Amendment name Steven Hilow as President and Mohammad Alipourlashkarian as registered agent, both at 2950 North Loop West # 500.
>
> In a June 25, 2007 letter, Mr. Alipourlashkarian stated that (1) Nelson Hensley was terminated as Behnad's counsel, (2) Mr. Hilow had resigned, and (3) Mr. Alipourlashkarian was returning to Iran.

Joint Pretrial Stmt, p. 9.  There was no testimony as to the continuing operations of Behnad.  It appears the Debtor has absconded.

*Factor nine:  The debtor was insolvent or became insolvent shortly after the transfer was made of the obligation was incurred.* As set forth above, the transfers of the properties did not make Behnad insolvent.  However, evidence was presented showing that Behnad had possession of $263,000 in rugs as of March 23, 2007; the rugs then disappeared.  Behnad is now insolvent and cannot pay the usury judgment.  The Court, therefore, finds that Behnad became insolvent shortly after the transfers were made.

### b. Factors Weighing Against a Finding of Fraudulent Transfer (Applies to All Properties)

The Court finds that factor ten is in favor of the transferees.

*Factor ten: The transfer occurred shortly before or shortly after a substantial debt was incurred.*  Debts are liabilities on claims.  TEX. BUS. & COM. CODE § 24.002(5).  Claims include contingent, unliquidated, disputed rights to payment not yet reduced to judgment.  *Id.* at 24.002(3).  The usury judgment debt arose at the time the usurious loan was made.  The loan was made in 2003.  The transfers did not occur until, at least, two years later.  The Court, therefore, finds that the transfers did not occur shortly before or after the debt was incurred.  This factor favors the transferees.

***c. Remaining Factors (Weight Based on Individual Circumstances of Property Transfers)***

The Court finds that the remaining factors, factors two, three, eight, and eleven, are specific as to each property.

*Factors two and three: The debtor retained possession or control of the property after the transfer. The transfer or obligation was concealed.* Although for purposes of TUFTA the time of the transfer is considered to be the time the deeds were perfected, in determining whether Defendants had intent to defraud, the Court must examine whether there was an overarching scheme to remove assets from Behnad.

Plaintiffs argue that the gap of time between the original date of the deeds and the recording of the deeds show that Defendants intended to conceal the transfers of the properties. The Court finds this to be true as to the Rancho Bauer, Tyneland Court and Leclerc properties. These three properties were transferred to Defendant personally. Rancho Bauer was held for three months while Tynland and Leclerc were held for over a year. Of the properties transferred, these three properties were the only properties that were not encumbered by any debt. The testimony revealed that Defendant agreed to "hold" the deeds. The transfers were allegedly done as an act of good faith between Defendant and Behnad. After the initial transfers, Behnad continued to hold itself out as controlling the properties. Accordingly, the Court finds that as to these three properties, Behnad retained possession of the properties after the transfers and the transfers were concealed.

The Ashford Brook, Rankin Road, FM 529, and Woodrows properties, however, were recorded fairly contemporaneously after the transfer between the parties. The evidence showed that after the transfers, Defendant made repairs on the properties, secured leases on the properties and was, otherwise, in control of the properties. Accordingly, the Court finds that as to Ashford

Brook, Rankin Road, FM 529 and Woodrows, Behnad did not retain control of the properties and the transfers were not concealed.

*Factor eight: The properties were exchanged for reasonably equivalent value*. All of the properties were exchanged for reasonably equivalent value except for the Rankin Road property. Accordingly, this factor weighs in favor of Tow as to the Rankin Road property transfer and in favor of Defendants as to the Rancho Bauer, Tyneland, Leclerc, Woodrows, FM 529 and Ashford Brook property transfers.

*Factor eleven: The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.* This factor only applies to the Woodrows property. The promissory note entered into on May 2, 2000, between Behnad and Defendant for $425,000 (and later extended to a five year term with a balance due on June 8, 2006, of $595,000), was secured by the Woodrows property. The Woodrows property was transferred to Defendant, Massood Pajooh, who transferred the property to Defendant (and insider) 3111 Chimney Rock. However, as set forth above, the debt on the Woodrows property exceeded its value, and, accordingly, the property is not an asset that can be fraudulently transferred.

The following chart sets forth a summary of the badges of fraud weighing in favor and against a finding of fraudulent transfer on each property:

| Summary of Badges of Fraud | | |
| --- | --- | --- |
| Property | Factors in Favor of a Finding of Fraudulent Transfer | Factors Against a Finding of Fraudulent Transfer |
| Rancho Bauer | 1, 2, 3, 4, 5, 6, 7, 9 | 8, 10 |
| Tyneland | 1, 2, 3, 4, 5, 6, 7, 9 | 8, 10 |
| Leclerc | 1, 2, 3, 4, 5, 6, 7, 9 | 8, 10 |
| Woodrows | 1, 4, 5, 6, 7, 9 | 2, 3, 8, 10 |
| Rankin Rd | 1, 4, 5, 6, 7, 8, 9 | 2, 3, 10 |
| FM 529 | 1, 4, 5, 6, 7, 9 | 2, 3, 8, 10 |
| Ashford Brook | 1, 4, 5, 6, 7, 9 | 2, 3, 8, 10 |

### d. Additional Factors

There are two more factors, however, that the Court finds heavily weighs in favor of Tow: (1) the Defendants' lies to federal banks; and (2) the progression of the usury lawsuit.

Consistently, Defendant and Behnad were untruthful in their representations as to valuing these properties on financial statements given to lending institutions.  The chart on page 18 sets forth the extreme disparity of the valuations.  Mansoor also testified that although he spoke with Mr. Alipourlashkarian the day after he filled out the erroneous 2005 Financial Statement to get the allegedly correct value of the properties, he did not submit corrected information to the institution to which he had presented the admittedly false 2005 Statement.  Furthermore, Massood and Mansoor simultaneously maintained that the Financial Statements prepared in 2005 and 2006 were correct in stating lease income, but that the properties were incomplete upon transfer and not yet generating income.

Ms. Musick, who the Court considered an extremely knowledgeable and credible witness, testified that the Financial Statements were irreconcilable with the tax returns.  At trial, the Court found Mansoor and Massood Pajooh's testimony to be evasive and unreliable.  Furthermore, the Court finds that the timing of the transfers and the post-judgment disappearance of the rugs, as described in the Court's analysis of factors five and seven, is highly suspect.  The Court finds that these factors weigh heavily in Tow's favor because they substantially affect the credibility of the Defendant and they show a willingness to engage in unsavory, financial conduct.

### e. Conclusion of Fraudulent Intent as to Specific Properties

Transfers are not avoidable under § 24.005(a)(1) if the transferee took in good faith and for a reasonably equivalent value.  TEX. BUS. & COM. CODE § 24.009(a).  As set forth above, all of the transfers except for the Rankin Road property were transferred for reasonably equivalent

value.   Section 24.009(a) is an affirmative defense for which Defendants bear the burden of proof.  It is not necessary for Tow to prove that Defendants acted in bad faith.  Defendants do not prevail on a good faith defense.   Defendant is a very closely related insider to Behnad. Defendant was aware of the filing and the progress of the usury lawsuit.  During the pendency of the usury suit, Behnad transferred all seven of its real properties to Defendant and later disposed of the rugs.   Therefore, the Court finds that the systematic disposition of essentially *all* of Behnad's assets, and the close relationship between the Pajooh brothers forecloses a finding a good faith.  Defendant offered substantially no evidence to meet his good faith burden.  In light of the substantial evidence tending to prove bad faith, the Court finds an absence of good faith.

Accordingly, after considering the factors set forth above, the Court finds that Behnad transferred the Rankin Road, FM 529, Rancho Bauer, Tyneland Court and Leclerc properties with intent to hinder, delay and defraud creditors.

### *6. After the transfers, did Debtor have unreasonably small assets?*

The only property which was not transferred for reasonably equivalent value was the Rankin Road property.  It was transferred on January 10, 2006, to County Investment.  As set forth above, the Court has determined that the Rankin Road transfer is a fraudulent transfer pursuant to § 24.005(a)(1).  However, for purposes of completeness, the Court will also examine the transfer under § 24.005(a)(2).

For a transfer to be avoidable under § 24.005(a)(2) the transfer must have been without receiving a reasonably equivalent value and the debtor:

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005(a)(2)(A) & (B).   The Court finds this transfer falls under § 24.005(a)(2)(A).   This transfer occurred on January 10, 2006, the same day as two other transfers.   The potential debt arising from the usury suit was in place at the time of the transfer. After the transfer of Rankin Road, Behnad proceeded to transfer (or hide) all of its assets.   The Court, therefore, finds that at the time of the Rankin Road transfer, Behnad was about to engage in transactions (disposing of all of its assets, failing to replenish assets, and incurring a judgment debt) for which its assets were unreasonably small in relation to the transaction.   Accordingly, the Court finds Rankin Road transfer is avoidable pursuant to § 24.005(a)(3)(A).

### Attorney's Fees

The Texas Uniform Fraudulent Transfer Act provides that the "court may award costs and reasonable attorney's fees as are fair and just." TEX. BUS. & COM. CODE § 24.013.   Tow's counsel testified that he incurred $95,000 in fees and $7,500 in expenses.   However, Tow's counsel is to be paid on a one-third contingency fee basis.   Expenses are to be paid after the contingency fee is calculated.

At the hearing, Defendants' counsel objected to the reasonableness of some of the fees. Tow's counsel stated that he had evaluated the reasonableness of the fees under *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).[18]   The Court finds the requested

---

[18] These factors include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (citing TEX. DISCIPLINARY R. PROF. CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULES, art. X, § 9) (formatting modified))

fees and expenses are reasonable.  Counsel for Tow is entitled to fees of one-third of the total recovery plus $7,500 in expenses.

### *Conclusion*

The Court holds that the Rankin Road, FM 529, Rancho Bauer, Tyneland Court, and Leclerc property transfers were fraudulent transfers pursuant to § 24.005(a)(1).  The Rankin Road property transfer was also fraudulent pursuant to § 24.005(a)(2)(A).  Section 24.008 of the Texas Business and Commerce Code provides that these transfers are avoidable "to the extent necessary to satisfy the creditor's claim."  TEX. BUS. & COM. § 24.008(a)(1).

Because the value of the transferred properties exceeds the amount of the underlying judgment plus attorney's fees, the Court does not avoid the transfers in their totality.  Instead, the transfers are avoided *to the extent* of the underlying judgment plus attorney's fees.  To implement this avoidance, the Court imposes a lien against the avoided transfers in the amount of $429,240.28[19] plus 2.12% post-judgment interest accruing from the date of entry of judgment to the date of payment.  A separate judgment will issue.

Signed at Houston, Texas, on August 28, 2008.

MARVIN ISGUR
United States Bankruptcy Judge

---

[19] This amount consists of $184,556.52 in damages + $61,518.84 in attorney's fees as awarded in the usury lawsuit (totals $246,075.36).  The judgment in the usury lawsuit was entered on February 6, 2007.  At that time, the post-judgment interest rate was 5.10%.  The judgment in this proceeding is issuing approximately 30 months after the usury judgment.  Thirty months of interest at 5.10% on $246,075.36 increases the usury judgment amount to $278,660.18, as of the date of issuance of this Opinion and Judgment.  To make Tow whole after the payment of attorney's fees and expenses, the lien must be for $429,240.28.